## WILLIAMS-THOMPSON COMPANY *v.* LOUISVILLE AND NASHVILLE RAILROAD COMPANY *et al.*

Under the pleadings and the evidence the judge did not err in refusing an injunction.

No. 4430. FEBRUARY 19, 1925.

Petition for injunction. Before Judge Bell. Fulton superior court. May 17, 1924.

*Hewlett & Dennis,* for plaintiff.

*McDaniel & Neely, Tye, Peeples & Tye, W. O. Wilson,* and *Dorsey, Brewster, Howell & Heyman,* for defendants.

ATKINSON, J. Certain railroad companies, having acquired certain lands in the City of Atlanta, on which they desired to construct certain terminal facilities for the use of the several railroads interested in the enterprise, acquired from the city upon valuable consideration land that had theretofore been used as a street, and the street was abandoned. In 1907 the terminal facilities, which consisted of certain office and warehouse buildings, side-tracks, and the like, were constructed. These were called the Atlanta Joint Terminals. After they were completed there remained of the railroads' lands south of such joint terminals certain vacant property. Several years thereafter the railroads, desiring to utilize this property and to encourage routing of freight over their respective lines, conceived the idea of constructing on such vacant property buildings to be rented to merchants who would occupy and use them in the conduct of their several businesses. The agent of the railroads

having the joint terminals in charge solicited a number of produce merchants located elsewhere in the city to become prospective occupants of the contemplated buildings, and their advice was requested as to the character of buildings and facilities that would be desired. The merchants gave their advice, and finally in 1913 a building was placed by the railroad companies on such vacant property, suitable for occupancy by the merchants in the conduct of wholesale and retail produce business. It was a long building extending from Central Avenue eastwardly to the Washington Street Viaduct. Platforms extended the full length of the building on the north and south sides. A driveway from Central Avenue extended along the south platform, for vehicles. A special side-track for the exclusive use of occupants of the building extended along the north platform, and north of this was another side-track that could be used when the first side-track might be congested, and there was a driveway approach to the second side-track. The building was three stories high, and was so constructed that car-loads of produce might be switched from other lines of railroad-track onto the special or platform track, and the freight therefrom taken directly onto the north platform and thence onto the floor of the building without lowering or hoisting, and in like manner might be delivered over the south platform onto trucks or other vehicles by which it might be delivered to customers of the merchants. A merchant occupying the building, purchasing goods in car-load lots, would save in cost of handling and drayage twelve to fifteen dollars per car. The space in the building was divided into sixteen sections numbered 1 to 16, inclusive, which were supplied with heat and light. The building was called Produce Row. All of the sections were leased at a uniform charge of $75 per month, added to which were charges for heat and light.

The Williams-Thompson Company, who were among the merchants solicited by the agent of the railroads, preliminary to embarkment into the enterprise conducted business at another place in the city, where they could get car-load deliveries of freight at their door, and were induced to move to Produce Row on account of the superior advantages which that place offered. The Williams-Thompson Company entered into a formal written lease for section number 12, beginning January 1st, 1914, and ending December 31st, 1918, with option to the lessee of five years additional. The

lease also contained a stipulation for a supply of light and heat at stated prices. Subsequently a similar lease contract was entered into between the Williams-Thompson Company and the director-general of railroads, acting by named Federal managers for the several roads. The term of this lease was from the first day of January, 1919, to the 31st day of December, 1923; provided that if the railroads should be released from control by the Federal government and turned back to the owners, "then" the lease should be null and void. There was never any subsequent lease; but after the railroads were turned back by the Federal government to their owners the Williams-Thompson Company were recognized as tenants, and they continued as such to occupy the rented premises and to pay the rent stipulated in the leases and contract charges for light and heat. In 1923 the railroad companies became dissatisfied with Williams-Thompson Company as a tenant, not for their failure to pay rent or charges for light and heat, but for other alleged reasons, including among them the failure to handle sufficient tonnage of freight in car-load lots, the allowance of persons who were not tenants of the building to place cars on the platform tracks which had been routed to the city over the lines of railroads other than those of the lessors, the keeping on storage of produce for other persons who were not tenants of the building, and the like; and accordingly, more than four months before December 31st, 1923, gave the Williams-Thompson Company formal written notice that the lease would not again be renewed and that on the date last above stated possession was desired of the rented premises. The Williams-Thompson Company refused to surrender possession, and in order to avoid eviction brought suit against the railroad companies for injunction.

There was evidence at the interlocutory hearing tending to show that all of the 15 remaining sections of the Produce Row were rented to other persons who were merchants engaged in the produce business, and who were competitors of the Williams-Thompson Company; and that if the Williams-Thompson Company should be evicted, they could not be afforded another place of business in the building. It also appeared that at the time the Atlanta Joint Terminals were constructed they were sufficient and have been sufficient ever since to handle with dispatch all the traffic for the general public coming over the several lines of the

defendants; and that Produce Row was never intended to be used by the public generally, and has not been so used. Also, that the lease under which the Williams-Thompson Company entered contained a clause that the lessee agrees "that all freight of the parties . . coming into or going out of the city of Atlanta, Georgia, shall be, in so far as may be lawful and consistent with equal freight rates, time and schedules, routed via the respective lines" of the lessors, "it being understood that cars reaching Atlanta by any line other than the respective lines of the" lessors "will be accepted from that line when offered, and switched to the track serving the building." It further appeared that the business of the Williams-Thompson Company and other tenants of the building had reference to the receipt and shipment of produce over the railroads from within and without the State, so that it had reference to both interstate and intrastate traffic. The judge refused a temporary injunction, and the plaintiffs excepted.

It is insisted that the trial judge abused his discretion in refusing an injunction, for the following reasons: First, because the railroad companies in acquiring Waverly Place contracted with the city in such manner as to give to the public such interest in Produce Row as that they would be required in the use of the property to treat all of the public alike; second, that the effect of the refusal of the railroad companies to allow the plaintiffs to continue the use of section 12 would amount to an unlawful discrimination against the plaintiffs and in favor of their competitors occupying other sections in Produce Row, and give to the latter a monopoly; and that the effect of allowing such competitors to retain the sections of Produce Row occupied by them, whereby they would save from $10 to $12 per car-load of freight, was the equivalent of allowing such competitors a rebate of freight, all of which is violative of the following provisions of the law: (a) Section 3 of the interstate-commerce act of 1887, prohibiting common carriers from granting undue or unreasonable preferences. 4 Fed. Stat. Ann. 379. (b) Section 6 of the interstate commerce act, which requires common carriers to furnish facilities for transportation, storing, and delivery of property, etc. Barnes Federal Code (1923 Supplement), § 7884(6). (c) Section 2 of the interstate-commerce act (Barnes Federal Code (1923 Supplement), § 7885), prohibiting common carriers from discriminat-

ing in favor of one person against another by the grant of rebates and the like. 4 Fed. Stat. Ann. 371, § 2. (d) The common law prohibiting unjust discrimination. (e) Art. 4, sec. 2, par. 4, of the constitution of the State of Georgia (Civil Code, § 6466), which limits the power of the General Assembly to authorize any corporation to make any agreement with any other corporation which may have the effect, or be intended to have the effect, to defeat competition in their respective businesses, or to encourage monopolies. (f) Art. 4, sec. 2, par. 1, of the constitution of the State of Georgia (Civil Code, § 6463), which empowers the General Assembly to regulate railroad freight and passenger tariff, preventing unjust discrimination, etc. (g) Rule 2 of the Georgia Public Service Commission, which requires service companies in the conduct of their intrastate business to afford all persons equal facilities in the conduct of such business, without unjust discrimination in favor of or against any; and wherever such facilities are afforded to one patron, whether upon a special rate or otherwise, such company shall be bound to afford to any other patron, or patrons, under substantially similar circumstances, like facilities upon like rates.

All of the reasons urged for showing an abuse of discretion by the trial judge in refusing an injunction are founded upon unjust discrimination. The judge was authorized to find that the railroad companies constructed Produce Row in the exercise of their power to use that property to encourage traffic over their respective railroads (*Louisville & Nashville Railroad Co*. v. *Maxey,* 139 *Ga.* 541, 77 S. E. 801), and that the enterprise represented by the construction and renting out of the sections in Produce Row was merely to facilitate their business as common carriers. It was not part of their public duty, and could never become such so long as the railroad companies had other facilities for serving all · of the public alike, and did serve all of the public alike, which the judge was authorized to find from the evidence. The judge did not err in refusing the injunction.

*Judgment affirmed.    All the Justices concur.*